## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 14 2015, 9:53 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Nathaniel S. Connor
Winchester, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of J.M., Mother, and C.W., Child,

J.M.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

April 14, 2015

Court of Appeals Case No. 68A01-1408-JT-342

Appeal from the Randolph Circuit Court

The Honorable Jay L. Toney, Judge

Cause No. 68C01-1311-JT-154

**Kirsch, Judge.**

[1] J.M. ("Mother") appeals the juvenile court's order terminating her parental rights to her child, C.W. ("Child"). She raises two issues on appeal, which we consolidate and restate as: whether sufficient evidence was presented to support the termination of Mother's parental rights.

[2] We affirm.

## Facts and Procedural History

[3] On June 5, 2004, Child was born to Mother. K.B. was the legal father of Child and voluntarily terminated his parental rights on December 11, 2013. V.W. was Mother's live-in boyfriend for approximately twenty-three years, including at the time that Child was removed from the home; V.W. may also be the biological father of Child.

[4] On March 15, 2012, Child and a sibling were removed from the care of Mother by the Indiana Department of Child Services ("DCS") based on allegations of unsanitary and unsafe conditions in the home due to the presence of dog feces, piles of trash, piles of laundry and dirty dishes, numerous electrical items in the bathroom sink, and numerous holes in the bathroom wall. Additionally, there were allegations that V.W. had sexually abused Child's sibling. Child was placed in foster care after removal from the home.

[5] On March 16, 2012, DCS filed a Child in Need of Services ("CHINS") petition, alleging unsanitary and unsafe living conditions, V.W.'s ownership of unregistered guns, and V.W.'s threats of suicide if the children did not do what V.W. wanted. On July 11, 2012, the juvenile court adjudicated Child to be a

CHINS. On August 16, 2012, the juvenile court issued its dispositional order, which, in relevant part, ordered Mother to participate in services and to: maintain suitable, safe, and stable housing and keep home structurally sound, sanitary, and safe; assist in formulating and enacting a plan to protect children from abuse or neglect; actively participate in home-based counseling and demonstrate positive results as a result; complete a parenting assessment and successfully complete all recommendations developed as a result; attend all scheduled visitations and comply with all visitation rules; and provide Child with a "safe, secure, and nurturing environment that is free from abuse and neglect and be an effective caregiver who possesses the necessary skills, knowledge, and abilities to provide [Child] with this type of environment on a long-term basis to provide [Child] with permanency." *Appellant's App*. at 37-38. On November 20, 2013, DCS filed its petition to terminate Mother's parental rights. Evidentiary hearings were held on March 19 and 20, 2014 and April 14, 2014.

[6] During the hearing dates, the following testimony and evidence was presented. Prior to Child's removal, in February 2012, the family received home and school based services through Centerstone, which were initially directed toward the older children and later toward Child due to the behaviors of Child. DCS became involved when it was reported that Child's older sibling disclosed to her therapist that V.W. sexually abused her. Before removal, Child interacted poorly with peers, had boundary issues, lacked focus, failed to do her homework, and had poor hygiene. Immediately after being placed in foster

care, Child exhibited behaviors such as extreme tantrums, refusing to shower, bed wetting, and urinating and defecating in her pants, even in public. Child's therapist attributed such behaviors to Child having experienced trauma while living in Mother's home and stated that Child had disclosed that V.W. watched the children touch themselves or masturbate, the older siblings instructed Child to masturbate, and Child would masturbate in front of her family members. When Child was first removed, she was placed in foster care from March 15, 2012 to mid-August 2012. As she became more familiar with her foster home and the foster parents' routine, she was easier to direct, had better hygiene, and completed her homework on time. Structure, discipline, and routine greatly impacted her improvement.

[7] Supervised visits between Mother and Child began in April 2012, occurred in Mother's home, and included parenting instruction during the visits. Mother would generally apply the instruction during the visit, but would not retain or apply it to future visits. Sometimes after these supervised visits, Child's behavior would regress, but not significantly. However, in April 2013, the visits became unsupervised, and Child's behaviors again became severe and included, throwing fits and screaming, stealing, kicking and hitting doors and walls, picking her skin until she bled and wiping blood on the walls, spitting, pulling her hair out, wetting the bed, and going to the bathroom in closets and other inappropriate places. By mid-June 2013, the behaviors became so severe that the foster parents had trouble finding babysitters.

[8] During this time, Mother told Child that she knew where the foster parents lived and could come over at any time. Foster mother saw Mother drive past the house on several occasions, and one time, Mother parked in a parking lot across the street from the foster home and was visible from Child's room. Because of this, Child would stare out the window and exhibit anxious behaviors such as picking at her hair and skin.

[9] Throughout the CHINS case, Mother had several service providers who offered parenting instruction to Mother. Early in the case, a service provider wanted Mother to have additional parenting education instead of just during visitations. Mother, however, claimed she would get additional education on her own. Mother did not retain the instruction she received during the visitations, and although she had an understanding of parenting, she was not able to apply what she knew. Mother's progress was inconsistent, and there was never any resolution of the things that the service providers worked on with her. For example, Mother was aware that Child was allergic to red dye in food and that it adversely affected Child's behavior, but Mother did not limit Child's intake of food containing red dye. Although Mother was informed about additional parenting services, she refused to participate, citing work, visitations, and lack of time. During visitation, Mother would not make time to help Child with her homework and would often distract her. Additionally, although Mother knew the rules, she did not apply them consistently and often fell back to old behaviors.

[10] In August 2013, Child returned to Mother for a trial home visit, which was supported by several service providers because they believed that Mother needed an opportunity to demonstrate if she could succeed with parenting Child after participating in services for a year. Not long after the trial home visit began, DCS was alerted that Child's behaviors worsened, particularly at school. Child was not able to function in a regular classroom and exhibited behaviors such as rolling on the floor, picking off pieces of the bulletin board, and scribbling violently on paper. During this time, Child lost weight, came to school unkempt, often fell asleep in the classroom, and stole food and other things from other children. Child also had bathroom issues, including spending long periods of time in the restroom and wiping feces on the toilets and restroom walls.

[11] On September 10, 2013, Child had a psychological evaluation, and she was diagnosed with anxiety disorder not otherwise specified and disruptive disorder. Child had previously been diagnosed with attention deficit disorder and was taking medications for ADHD and anxiety. At the time of her evaluation, the doctor did not see any signs that would cause him to believe that Child had autism spectrum disorder.

[12] In late September 2013, the trial home visit with Mother ended out of concern for Child's well-being and safety. After her removal from Mother's home, DCS placed Child with a second foster family due to the original foster parents' belief they could no longer care for Child because of her anxiety about Mother's visits and driving by the foster home. Child lived continually in the second foster

home until the time of the termination hearing. However, two days after she first moved there, Child removed all her clothing and said, "Look at me," and at other times, she pulled down her pants and said, "Bite me." *Tr.* at 130, 132. Child also defecated in her hand and smeared feces "everywhere," urinated behind her bed, swore, and ignored people and talked over them. *Id.* at 131. Child's behaviors improved shortly after moving into her new foster home, and these behaviors stopped by the end of December 2013. Child responds well to the parenting style and structure of her foster home.

[13] When the trial home visit ended, the juvenile court ordered therapeutically supervised visitation with Mother and Child. Amber Moody ("Moody"), a therapist with Centerstone who supervised these visits, observed that Child had very little attachment to Mother. Child did not show much excitement in seeing Mother, there was little engagement during the visits, and Child was not sad when the visits ended. Mother was not very welcoming and warm toward Child and would sometimes fall asleep or be on her phone during the visits. As the visitations progressed, Child still seemed estranged from Mother, and due to this, Moody recommended that the visits be reduced due to lack of progress. When Moody informed Mother, Mother did not ask why or request more visitations.

[14] Barbara Bush ("Bush"), also from Centerstone, supervised seven visits with Mother and Child. At one of these supervised visits, Child went to the bathroom, locked herself in a stall, and would not unlock the door when Bush asked her to do so. Bush observed Child over the stall partition to be having a

bowel movement and inserting her fingers in her anus and wiping feces on the rail in the stall. Bush described Child as being "zoned out." *Id*. at 288. Both Bush and Mother told Child to stop, but Child did not respond. Bush crawled under the stall to get Child. Mother had little reaction to the situation and asked to go outside to smoke.

[15] At the time of the termination hearing, Child had been removed from Mother's home for over two years, except for the seven weeks during the trial home visit, and had not seen Mother for at least ten weeks prior to the hearing. Child had been in two different foster homes and showed improvement in her behaviors not long after moving into each one. Child's behaviors worsened when Child visited with Mother. The DCS plan for Child was adoption by her foster parents. On July 9, 2014, the juvenile court issued its detailed findings, conclusions, and order[1] terminating Mother's parental rights. Mother now appeals.

## Discussion and Decision

[16] We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. When reviewing a termination of parental rights case, we will not reweigh the

---

[1] We commend the juvenile court for the thoroughness of its findings, which greatly aided in our appellate review.

evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re B.J.*, 879 N.E.2d at 14.

[17] Here, in terminating Mother's parental rights to Child, the juvenile court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[18] The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution. *In re C.G.*, 954 N.E.2d 910, 923 (Ind. 2011). These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013). In addition, although the right to raise

one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.*

[19] Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

[20] Mother argues that DCS failed to prove the required elements for termination by sufficient evidence. Specifically, Mother contends that DCS failed to present sufficient evidence that the conditions that resulted in Child being removed

would not be remedied. She asserts that the initial reasons for removal of Child from the home have been remedied, and the only condition not remedied is Child's mental health issues, which were not evaluated and monitored sufficiently by DCS prior to termination. Mother also argues that DCS failed to present sufficient evidence that the continuation of the parent-child relationship posed a threat to Child. She alleges that, because Child's mental health issues were not adequately and appropriately evaluated, any correlation between Child's behavior and Mother's visits was "superficial." *Appellant's Br.* at 17. Mother, therefore, claims that the juvenile court's judgment was clearly erroneous.

[21] In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home would be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, "we must ascertain what conditions led to their placement and retention in foster care." *Id.* Second, "we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id.* (citing *In re I.A.,* 934 N.E.2d 1132, 1134 (Ind. 2010) (citing *In re A.A.C.,* 682 N.E.2d 542, 544 (Ind. Ct. App. 1997))). In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against " 'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K.,* 989

N.E.2d at 1231). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *Id.* Although trial courts are required to give due regard to changed conditions, this does not preclude them from finding that parents' past behavior is the best predictor of their future behavior. *Id.*

[22] Here, the evidence showed that Child was removed from Mother's home based on allegations of unsanitary and unsafe conditions in the home due to the presence of dog feces; piles of trash, laundry, and dirty dishes; numerous electrical items in the bathroom sink; and many holes in the bathroom wall. There were also allegations that V.W. had sexually abused Child's sibling. Additionally, before removal, services were offered to Child due to reported behaviors of interacting poorly with peers, having boundary issues, lacking focus, failing to do her homework, and having poor hygiene.

[23] Although Mother moved away from V.W. and into a home that was clean and appropriate for children during the underlying proceedings, Child's main need was structure. Mother was provided services during the CHINS proceedings, but was unable to retain or apply the instruction given to future visits with Child. Child's behavior improved significantly when subjected to the structure and routine of her foster homes, but would worsen after visits with Mother, particularly during the seven-week trial home visit. The importance of parenting instruction was highlighted early in the underlying case, and Mother was provided with parenting instruction from at least four service providers. Despite being told to obtain more education than what was provided during

visitations, Mother refused offered help from the service providers, instead indicating she wished to get it on her own. Mother failed to address her parenting issues.

[24] Mother's ability to parent Child did not improve even with the instruction given by the service providers. During visitations with Child, Mother did not show any progress and was resistant to the instruction. Additionally, Mother's relationship with Child did not improve. Mother was not warm and welcoming to Child and would sometimes fall asleep during visits or be on her phone. Child showed very little attachment to Mother, and the two were not bonded.

[25] Mother's argument focuses on Child's emotional and psychological issues and her contention that DCS failed to sufficiently evaluate and monitor these issues prior to termination. The evidence showed that Child's behaviors were developed while in Mother's care and worsened when Mother had contact with Child. Such behaviors were being dealt with and corrected when Child was in foster care and away from Mother's care and custody. Based on the evidence presented, we conclude that the juvenile court did not err in finding that there was a reasonable probability that the conditions that resulted in the removal and the reasons for continued placement of Child outside Mother's home would not be remedied.

[26] Mother also contends that DCS failed to prove by clear and convincing evidence that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of Child. However,

we need not address such argument. Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S.*, 987 N.E.2d at 1156. Therefore, as we have already determined that sufficient evidence supported the conclusion that the conditions that resulted in the removal of Child from Mother's care would not be remedied, we will not address any argument as to whether sufficient evidence supported the conclusion that the continuation of the parent-child relationship posed a threat to the well-being of Child. Additionally, Mother has a section in her brief contending that the "juvenile court's judgment violated [her] Fourteenth Amendment rights." *Appellant's App.* at 19. Mother's argument, however, focuses on the basis for the termination of her parental rights and not a separate due process violation. We, therefore, treat her argument as a part of her challenge to the sufficiency of the evidence and do not separately address it.

[27] We will reverse a termination of parental rights "only upon a showing of 'clear error'--that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *In re Egly*, 592 N.E.2d 1232, 1235 (Ind. 1992)). Based on the record before us, we cannot say that the juvenile court's termination of Mother's parental rights to Child was clearly erroneous. Further, Mother's arguments are merely a request for us to reweigh the evidence and judge the credibility of

the witnesses, which we cannot do on appeal. *In re D.D.*, 804 N.E.2d at 265. We therefore affirm the juvenile court's judgment.

[28]   Affirmed.


Friedlander, J., and Crone, J., concur.